COURT OF CHANCERY
OF THE
STATE OF DELAWARE

SELENA E. MOLINA
MAGISTRATE IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

Final Report: September 6, 2024
Date Submitted: May 23, 2024

Brian V. DeMott, Esquire
Allison Neff, Esquire
McCollom D'Emilio Smith
Uebler LLC
2751 Centerville Road, Suite 401
Wilmington, DE 19808

Donald L. Gouge, Jr., Esquire
Donald L. Gouge, Jr., LLC
800 King Street, Suite 303
Wilmington, DE 19801

Re: *Elmer Yu, Trustee of the Elmer Yu Revocable Trust, et al. v. James Cahill, et al.*, C.A. No. 2022-0014-SEM

Dear Counsel,

Through this action, neighbors seek to enforce deed restrictions which have governed their development since 1945. Pending before me are the parties' cross-motions for summary judgment, whereby the parties have stipulated to a decision on a stipulated record, in lieu of trial. For the reasons I will explain, I find in favor of the petitioners and recommend that injunctive relief be issued to remedy the respondents' noncompliance with the restrictions. This is my final report.

## I.    BACKGROUND[1]

This action was brought by Dr. Elmer Yu and Wilma Yu, as trustees of the Elmer Yu Revocable Trust U/A/D 08/11/2021 and the Wilma Yu Revocable Trust U/A/D 08/11/2021 (the "Trusts"), and Christine Welch (collectively, the "Petitioners") against James and Elaine Cahill (the "Respondents" and, together with the Petitioners, the "Parties"). The Petitioners seek a mandatory injunction related to the installation of a fence on real property located at 28 Boulder Brook Drive, in Wilmington, Delaware, within the Boulder Brook residential development (the "Boulder Brook Development"). Per the Petitioners, the fence violates deed restrictions, more fully described below, which bind the properties at issue (the "Restrictions"). I begin with some background on the community, before turning to the Restrictions, the Parties, and the dispute before me.

### A.    Boulder Brook

The Boulder Brook Development is a "small neighborhood[,]"[2] which includes approximately 33 properties.[3] The neighborhood was described by one

---

[1] This background comes from the parties' stipulated record. *See* Docket Item ("D.I.") 52 ("Stip."). Deposition testimony is cited to as "[First Initial.] [Last Name] Dep." *See* D.I. 55 ("Pet'rs' Mot."), Ex. B ("W. Yu Dep."), C ("C. Welch Dep."), D ("E. Cahill Dep."), E ("E. Yu Dep.").

[2] W. Yu Dep. 4:16.

[3] Stip. ¶ 3(e).

resident as "a very cohesive, friendly neighborhood[,]" which would come together for "neighborhood garage sales, . . . holiday get-togethers at Christmastime, [and] summer picnics."[4]

The Boulder Brook Development is managed, to some extent, by the Boulder Brook Civic Association (the "Civic Association"). The Civic Association "monitors the activity of the neighborhood, helps with the snow removal, [and] helps with neighbors that have situations[.]"[5] At the time of depositions in this action, the Civic Association was run by a president and treasurer.[6] The secretary seat had been vacant for several years because "nobody want[ed] to do it anymore."[7] Thus, the Civic Association appears to operate leanly. It also has no separate architectural review committee.[8]

## B.     The Restrictions

Properties within the Boulder Brook Development are governed by the Restrictions, which were recorded in the Office of the Recorder of Deeds in and for

---

[4] W. Yu Dep. 4:17–24.

[5] E. Yu Dep. 11:5–8.

[6] W. Yu Dep. 4:7–9, 5:6–8.

[7] *Id.* at 5:16–18, 7:24–8:2. But Dr. Yu testified that there was a new secretary recently installed. E. Yu Dep. 12:18–19.

[8] W. Yu Dep. 12:9–11.

New Castle County on December 15, 1945.[9] They were subsequently amended and

recorded on December 19, 1997.[10] The Restrictions set forth requirements for the

Boulder Brook Development and explain, to some extent, the role of the Civic

Association.

This action requires my review of three sections in the Restrictions: Section

2, Section 7, and Section 9. I will briefly address each in turn.

Section 2 provides in pertinent part:

> APPROVAL OF PLANS. No building, fence, wall or other structure
> shall be commenced or erected, nor shall any addition to or change or
> alteration therein be made, until reasonable plans and specifications
> have been submitted to and approved in writing by one third or more of
> the residents of Boulder Brook Development, which approvals shall
> include approval by a majority of residents residing on each contiguous
> or adjacent lot. Each resident of Boulder Brook Development shall have
> the right to refuse to approve any such plans or specifications for any
> reason. Any resident objecting to any approved plans or specifications
> may, with the written concurrence of a majority of the residents of
> Boulder Brook Development, lodge a complaint with the Boulder
> Brook Civic Association.[11]

---

[9] Stip. ¶ 3(g).

[10] *Id.*

[11] D.I. 1 ("Compl."), Ex. E at 3.

Section 7 prohibits the installation of any fence that is not "open" or is greater than four feet in height.[12] Finally, Section 9 contains an anti-waiver clause which provides in pertinent part:

> The failure to exercise any rights or remedies by the said Boulder Brook Civic Association or by any person having such right or remedy, upon the violation or breach of any of these restrictions or covenants, shall not be construed or interpreted as a waiver of such right or remedy, and shall not prevent any person from later exercising said right or remedy in connection with said violation or breach or any later violation or breach of these restrictions[.]"[13]

### C.     The Parties

The Parties are residents of the Boulder Brook Development.[14] Dr. Elmer Yu and Wilma Yu reside at 30 Boulder Brook Drive (the "Yu Property"), which is owned by the Trusts.[15] Two houses away is Christine Welch's property and residence, 26 Boulder Brook Drive (the "Welch Property").[16] The Respondents' property and residence sits in the middle of the Yu Property and the Welch Property, at 28 Boulder Brook Drive (the "Cahill Property").[17]

---

[12] *Id.* at 4.

[13] *Id.*

[14] Stip. ¶ 3(d).

[15] *Id.* ¶ 3(b); Pet'rs' Mot., Ex. A. Dr. Yu is a physician, "a surgeon by training," but as of his deposition was involved in "new medication development." E. Yu Dep. 5:15–18.

[16] Stip. ¶ 3(c).

[17] *Id.* ¶¶ 3(a), (f).

The Respondents are the new kids on the block. The Yus have lived at the Yu Property for 28 years; Ms. Yu has also served as the president of the Civic Association for 20 years.[18] Ms. Welch has lived at the Welch Property since 2005.[19] She has not served as an officer of the Civic Association, but Ms. Welch testified that she pays her dues, attends meetings, and participates in discussions.[20] Then there are the Respondents; the Respondents purchased the Cahill Property on July 15, 2021.[21] Before that, they had lived in Forked River, New Jersey for 30 years.[22]

### D.     The Fence

In or around September of 2021, the Respondents installed a six-foot, enclosed stockade fence (the "Fence") on the Cahill Property.[23] Ms. Cahill testified that they wanted the Fence to protect them and their two terriers.[24] She further explained that they chose "stockade wood" because their dogs "are prone to climb

---

[18] W. Yu Dep. 4:3–12.

[19] C. Welch Dep. 3:20–22.

[20] *Id*. at 4:2–8, 6:8–14. Ms. Welch's late husband was, at one time, the treasurer of the Civic Association. *Id.* at 6:12–14.

[21] Pet'rs' Mot., Ex. F.

[22] E. Cahill Dep. 8:5–11.

[23] Stip. ¶ 3(i).

[24] *See* E. Cahill Dep. 16:20–17:10.

wire" and they selected their fence to match the "six-foot fence across the back of the property that is owned by the people behind" the Respondents.[25]

The Respondents went forward with construction without first seeking permission through submitting a plan or specifications for the Fence to the Civic Association or other homeowners in the Boulder Brook Development.[26] While the Fence was being constructed, or immediately prior thereto, Dr. Yu went to the Cahill Property to discuss with the Respondents his concern that the Respondents were violating the Restrictions.[27]

Per Ms. Cahill, Dr. Yu arrived when the Respondents "had a house full of company at nine o'clock at night."[28] During that visit, per Ms. Cahill, Dr. Yu told the Respondents "that there was a deed restriction and he handed [them] a bunch of photostatic papers with pages missing and he said [they] can't put a fence up[.]"[29] In response, per Ms. Cahill, Mr. Cahill told Dr. Yu that the Respondents were

---

[25] *Id.* at 18:15–19:14. The Respondents hired a contractor to construct the Fence; the contractor charged $9,000.00 for construction. *Id.* at 15:9–21.

[26] Stip. ¶¶ 3(j), (k).

[27] *See* E. Yu Dep. 16:2–12. Ms. Cahill testified that this discussion was during construction; per Dr. Yu, it was before construction started. *Compare* E. Cahill Dep. 22:11–13, *with* E. Yu Dep. 16:23–24.

[28] E. Cahill Dep. 21:13–16.

[29] *Id.* at 21:19–22.

"protecting [their] lives and [their] property in putting a fence up."[30] Dr. Yu's recollection is different; per Dr. Yu, the visit and discussion was during the day, Dr. Yu's approach was more amicable, and, in response, Mr. Cahill "closed the door in [Dr. Yu's] face."[31]

Details aside, there is no dispute that this conversation did not resolve the neighbors' dispute. Thus, while the Respondents were constructing the Fence, "a notice was sent out to all the neighbors that the [F]ence was being built in violation of the deed restriction[.]"[32] Ms. Yu testified that the notice informed residents that legal action would be pursued because the Respondents "refuse[d] to enter . . . into any discussion regarding the events."[33] As to who would pursue that legal action, Ms. Yu explained that the Civic Association's officers discussed the matter and

---

[30] *Id.* at 21:22–22:1. Per Ms. Cahill, the Yus visited the Cahill Property frequently to complain about the construction of the Fence to the Respondents' daughter, workers, and others present. *See id.* at 28:10–29:3, 30:2–9.

[31] E. Yu Dep. 18:3–15. These disputed details are not material to the issues before me.

[32] W. Yu Dep. 6:3–6; *see also* C. Welch Dep. 8:22–9:2 (explaining that she "believe[s] there was a notice just letting the community know that there was a dispute about the fence that was being built at [the Cahill Property]").

[33] W. Yu Dep. 6:3–9. But Ms. Yu also confirmed at her deposition that she had not had any significant contact with the Respondents. *Id.* at 12:18–24; *see also* E. Cahill Dep. 21:6–8 (confirming she never had a conversation with Ms. Yu). Ms. Welch also testified that she did not have any contact with the Respondents. C. Welch Dep. 11:11–13. But Ms. Welch did have a short conversation with the Respondents' daughter. *Id.* at 11:14–12:19.

"elected" to have it handled individually, by the neighboring property owners, rather than through the Civic Association.[34]

> At her deposition, Ms. Yu explained why she opposed the Fence as follows:
>
> Part of the feel of this neighborhood has been the open park-like atmosphere. That's part of the quality of life, that's part of the charm of this neighborhood. We've had a lot of wildlife that used to come through the property. We have an issue with the fence obstructing the water flow. We live on a hill, so all the water flows downhill. The fence obstructs the water flow, so then we have flooding at that area of the fence[.][35]

But she went on to emphasize: "the biggest thing is it really does affect the charm and the appeal of th[e] neighborhood."[36] Ms. Welch agreed, testifying:

> Before the fence was built, I could look up the street or look up the backyards and see, if I heard something odd, I could look up the street and see whether something was going on in the Yus' backyard, they could see if some[thing] was going on in my backyard to be concerned of. And it does give you that more open feeling, which is what we like about Boulder Brook, is you do feel like you're living in a parkland, and [the Fence] certainly does take away from that feeling.[37]

---

[34] W. Yu Dep. 7:5–9. Ms. Welch testified that she was involved in that decision and agreed it was more appropriate for the directly affected neighbors to bring suit. C. Welch Dep. 17:17–22, 25:5–15; *see also* E. Yu Dep. 23:17–19 ("I felt it was more efficient that we pursued this thing as a neighbor, it would be better.").

Ms. Yu further testified that, during her 20 years as president, the Civic Association never took legal action to enforce the Restrictions, but the neighbors did address violations informally. *See* W. Yu Dep. 8:5–9:5, E. Yu Dep. 13:6–11.

[35] W. Yu Dep. 17:22–18:10.

[36] *Id.* at 18:11–13.

[37] C. Welch Dep. 15:1–14; *see also id.* at 21:24–23:17 (explaining further reasons for her objection); E. Yu Dep. 35:16–21 (describing the Fence as "unsightly" and incongruous with the prior park-like atmosphere).

But the Fence does not stand alone. There are three other fences in the Boulder Brook Development (the "Other Fences").[38] The Other Fences are "not 'open' fences[,]"[39] and are on property that is not "contiguous with or immediately adjacent to the Yu Property, the Cahill Property, or the Welch Property."[40] Other than photos taken from the street, the record does not include "specific physical characteristics of the [Other Fences], including the dimensions of their length and height[.]"[41] Nor do we know "[t]he specific circumstances regarding the approvals, if any," or homeowner consent to the Other Fences.[42]

### E.    Procedural Posture

The Petitioners initiated this action on January 5, 2022, through a complaint seeking a declaratory judgment and injunctive relief.[43] Service of the complaint initially proved challenging for the Petitioners; at their request, I approved an

---

[38] Stip. ¶ 3(m).

[39] *Id.*

[40] *Id.* ¶ 3(n).

[41] *Id.* ¶ 3(s); *see also* D.I. 56, App. at A001–04 (photos).

[42] Stip. ¶ 3(r). But, per Ms. Yu, for prior fences the residents "talked to their neighbors and it's been agreed upon and . . . a four [foot] fence [was] erected[.]" W. Yu Dep. 9:7–17.

[43] Compl at 6.

alternative means of service, which was effective and caused the Respondents to answer the complaint on April 12, 2022.[44]

On October 13, 2022, I granted the Parties' proposed schedule, setting a two-day trial beginning on Wednesday, October 18, 2023.[45] Despite agreeing to this schedule, on January 11, 2023, the Respondents moved to stay discovery and delay this action by "a few months" to permit the Respondents to pursue, without interference, a complaint they filed with the State of Delaware Human Relations Commission on January 9, 2023.[46] The Petitioners opposed the request, on which I heard argument April 4, 2023.[47] Thereafter, I directed the Parties to submit supplemental briefing, which was completed by April 18, 2023.[48] Ultimately, on May 26, 2023, I issued an order denying the motion to stay and keeping this action on track.[49]

The Parties proceeded to litigate, but during the October 9, 2023 pretrial conference, the Parties indicated an interest in working toward a stipulation to limit

---

[44] D.I. 5–11, 13.

[45] D.I. 20. The schedule was amended on December 2, 2022 to adjust internal deadlines; the trial date was unchanged. *See* D.I. 23.

[46] D.I. 27.

[47] *See* D.I. 30, 31, 34.

[48] D.I. 35–37.

[49] D.I. 38. No exceptions were filed.

or resolve the few factual issues for trial.[50] After a step in the wrong direction, the Parties ultimately filed a stipulation and proposed order to have the matter resolved via cross motions for summary judgment on a stipulated record.[51] Trial was cancelled, summary judgment briefing was complete on December 28, 2024, and on May 23, 2024, I heard oral argument and took this matter under advisement.[52]

## II.    ANALYSIS

Under Court of Chancery Rule 56, this Court will grant summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."[53] Where cross-motions for summary judgement are filed and the parties do not argue issues of material fact are in dispute, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[54]

Here, the Parties have stipulated to a decision based on the agreed-upon record for their competing motions for summary judgment. Those motions teed up three primary disputes regarding (1) the enforceability of the Restrictions, (2) the

---

[50] *See* D.I. 50.

[51] D.I. 51; *see also* D.I. 50, 54.

[52] D.I. 55–58, 65.

[53] Ct. Ch. R. 56(c).

[54] Ct. Ch. R. 56(h).

suitability of injunctive relief, and (3) fees and costs. I address (1) within the framework of (2), before turning to (3). As further explained herein, I find (A) injunctive relief warranted because the Petitioners have demonstrated the Restrictions are enforceable, were breached, and the equities weigh in favor of removal and (B) costs, but not fees, should be shifted in the Petitioners' favor.

### A. Injunctive relief should be awarded.

The Petitioners seek injunctive relief, requiring the Respondents to remove the Fence. To prevail, the Petitioners needed to prove, by a preponderance of the evidence: "(1) actual success on the merits of the claims; (2) that the [Petitioners] will suffer irreparable harm if injunctive relief is not granted; and (3) that the harm to the [Petitioners] outweighs the harm to the [Respondents] if an injunction is granted."[55] I find the Petitioners have met their burden and thus injunctive relief should be awarded.

### 1. The Petitioners have demonstrated actual success on the merits.

To demonstrate actual success, the Petitioners had to establish that the Restrictions are enforceable and were breached by the Respondents. They have met

---

[55] *Benner v. Council of Narrows Ass'n of Owners*, 2014 WL 7269740, at *11 (Del. Ch. Dec. 22, 2014) (citing *Examen, Inc. v. VantagePoint Venture P'rs 1996*, 2005 WL 1653959, at *2 (Del. Ch. July 7, 2005)); *see also Civic Ass'n of Surrey Park v. Riegel*, 2022 WL 1597452, at *9 (Del. Ch. May 19, 2022) ("The burden of proof for these claims and defenses is by a preponderance of the evidence.").

this burden and I reject the Respondents' argument that the right to enforce the Restrictions has been waived.

The Petitioners contend the Respondents violated Sections 2 and 7 of the Restrictions. Section 2 requires preapproval of any plans to construct fences and is a type of architectural review covenant.[56] Although "generally upheld as valid . . . [architectural review] covenants . . . must be carefully evaluated because their arguably subjective nature introduces the risk of arbitrary and capricious application."[57] In conducting that careful review, this Court will consider (1) notice of the restrictions, (2) whether they "present clear, precise, and fixed standards of application," and (3) whether they were arbitrarily applied.[58] Notice is not at issue here—the Respondents concede that they had constructive notice because the Restrictions were recorded. That is sufficient and no greater showing is required.[59] Application is also not at issue; because the Respondents never submitted a plan for approval, Section 2 was never applied. Thus, the only question truly before me is

---

[56] *See Riegel*, 2022 WL 1597452, at *8 (describing architectural review covenants as those "requir[ing] prior review and approval of plans for improvements").

[57] *Lawhon v. Winding Ridge Homeowners Ass'n, Inc.*, 2008 WL 5459246, at *5 (Del. Ch. Dec. 31, 2008).

[58] *Id.*

[59] *Cf. Mendenhall Vill. Single Homes Ass'n v. Harrington*, 1993 WL 257377, at *2 (Del. Ch. June 16, 1993) ("It is axiomatic that restrictive covenants may be enforced against a purchaser only if he or she had notice, either actual or constructive, of their existence.").

whether the Restrictions are subject to arbitrary and capricious application and, as such, are unenforceable as written. I find Section 2 unenforceable; but Section 7 remains viable.

### a.    Section 2 is unenforceable.

Architectural review covenants, like Section 2, must have "clear, precise, and fixed standards of application."[60] Such is necessary to "constrain subjectivity and promote even-handed application."[61] Specificity also ensures adequate notice to homeowners regarding what is restricted; "[r]estrictive covenants which are too vague to serve these functions of notice and fairness are unenforceable."[62]

Section 2 has no fixed standards, is rife with subjectivity, and is unenforceable. Section 2 requires plans to construct any fences be submitted for preapproval. Approval must be made by both one-third (or more) of the residents of the Boulder Brook Development and a majority of the contiguous or adjacent residents. This broad power conferred on the community comes with no objective, non-arbitrary strings attached. The preapproval power is, thus, subject to arbitrary and capricious application, fails to provide adequate notice of restrictive conduct, and is not enforceable.

---

[60] *Lawhon*, 2008 WL 5459246, at *5.

[61] *Id.*

[62] *Id.*

**b.** **Section 7 is enforceable.**

But that does not end my inquiry. Even with Section 2 unenforceable, Section 7 remains. "Interpreting deed restrictions is a matter of contract interpretation" under Delaware contract law.[63] Under this lens, I must read the Restrictions "as a whole, giving effect to each term and provision, 'so as not to render any part of the contract mere surplusage.'"[64] Thus, Section 2's unenforceability does not negate my separate review of Section 7.[65]

Section 7 is clear and unambiguous. Section 7 provides: "No fence other than an open fence, and no fence of any kind more than 4 feet in height, shall be erected or maintained" within the Boulder Brook Development. This provision provides notice to all those within the community as to what is required, is enforceable as written, and needs no further interpretation.

---

[63] *Wild Quail Golf & Country Club Homeowners' Ass'n, Inc. v. Babbitt*, 2021 WL 2324660, at *3 (Del. Ch. June 3, 2021), *adopted*, (Del. Ch. June 17, 2021).

[64] *Centene Corp. v. Accellion, Inc.*, 2022 WL 898206, at *5 (Del. Ch. Mar. 28, 2022) (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

[65] True, Section 2 also references "fences," but "[s]pecific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005). To negate or ignore the specific requirements in Section 7 due to the unenforceability of Section 2 would violate this principle of contract interpretation and fail to uphold the community's social contract.

> **c.** **The Respondents violated Section 7 and their waiver argument should fail.**

The Respondents do not dispute that they violated Section 7 by installing a fence that is both closed off and above four feet. But the Respondents argued, for the first time in their summary judgment briefing, that the ability to enforce the Restrictions was waived. In response, the Petitioners highlight (1) that the Respondents did not assert a waiver defense in their answer, (2) the Restrictions contain an anti-waiver provision, and (3) the Respondents fail to meet the burden necessary to establish waiver. I agree with the Petitioners; the Respondents' waiver argument should fail.

First, the Respondents should have pled waiver as an affirmative defense in their answer. Under Court of Chancery Rule 8(c), "[i]n pleading to a preceding pleading, a party shall set forth affirmatively . . . waiver[.]"[66] The Respondents failed to do so. Second, the Respondents have not articulated any basis on which to overcome the anti-waiver provision in the Restrictions. This Court has enforced similar anti-waiver provisions.[67] The Respondents have given me no reason to depart

---

[66] Ct. Ch. R. 8(c). This citation reflects a prior version of Rule 8 in effect when I took this matter under advisement. By way of context, among others, Rule 8 was amended effective June 14, 2024, and then corrected and amended again effective July 12, 2024.

[67] *See, e.g.*, *Brandywine Hills Cmty. Ass'n v. T. Bruce Wilmoth Const. Co.*, 1995 WL 767336, at *9 (Del. Ch. Dec. 21, 1995).

from this precedent. Third, and finally, the Respondents failed to discover, and thus failed to present, evidence showing that "more likely than not," there was a knowing waiver. Even assuming I forgive the pleading deficiency and the Respondents find a way around the anti-waiver language in the Restrictions, the Respondents fall short of meeting their burden to prove waiver.[68]

> **2.** **The Petitioners will suffer irreparable harm absent injunctive relief, and balancing the harms favors the Petitioners.**

The second element of a request for permanent injunctive relief is that the moving party will suffer irreparable harm absent relief. In deed restriction cases, irreparable harm is nearly presumed. As then-Vice Chancellor Steele explained:

> The [homeowners within a community with deed restrictions] knowingly enter into a social contract with the other lot owners when purchasing their land. This contract includes adhering to the Restrictions' restrictive covenants. Relying on the covenant, many lot owners have invested a large amount of time and money improving their lots, including building residences for themselves. Once a restriction is breached, the [homeowners association] can never again regain the sanctity of the covenant.[69]

---

[68] *See Quail Vill. Homeowners Ass'n, Inc. v. Rossell*, 2018 WL 6534456, at *10 (Del. Ch. Dec. 10, 2018) ("A waiver of deed restrictions usually involves a failure to object to other violations of the same or similar restriction such that it would be unfair to allow the claimant to enforce the [restriction] against the current violation. . . . [The defendant] bears the burden of proof on her affirmative defense of waiver, and the ability to preclude enforcement due to waiver occurs only to the extent of the waiver she demonstrates. If waiver is not shown for a particular deed restriction, then it remains in effect.") (first brackets in original) (citation and quotation marks omitted).

[69] *Slaughter v. Rotan*, 1994 WL 514873, at *3 (Del. Ch. Sept. 14, 1994).

The third element then requires me to balance the harms. Although injunctive relief may be an extreme remedy at times, it is appropriate when there would not be "substantial economic harm" to the noncompliant homeowners.[70] That is because "[e]quity will not reward a knowing breach of restrictions."[71]

I find Vice Chancellor Noble's decision in *The Cove on Herring Creek Homeowners' Association, Inc. v. Riggs* on point.[72] Therein, Vice Chancellor Noble ordered injunctive relief, mandating the removal of unapproved sheds.[73] Because the homeowners failed to make any showing of "substantial economic harm if they are required to remove their sheds[,]" Vice Chancellor Noble granted injunctive relief.[74]

I recommend the same here. The Respondents, despite constructive notice of the Restrictions, violated Section 7, which unequivocally barred closed fences and fences higher than four feet tall. The harm to the Petitioners is evident from the

---

[70] *Cove on Herring Creek Homeowners' Ass'n, Inc. v. Riggs*, 2003 WL 1903472, at *6 (Del. Ch. Apr. 9, 2003).

[71] *Quail Vill.*, 2018 WL 6534456, at *3; *Plantation Park Ass'n, Inc. v. George*, 2007 WL 316391, at *5 (Del. Ch. Jan. 25, 2007) (explaining this Court may "discount harm resulting for the knowing breach of the covenant" in its balancing analysis).

[72] 2003 WL 1903472.

[73] *Id.* at *6.

[74] *Id.*

breached social contract.[75] The Respondents, on the other side, have failed to demonstrate that if injunctive relief were to be granted that there would be any substantial economic harm to them that would outweigh the harm they caused.[76] Injunctive relief should be issued directing the Respondents to remove the Fence.

## B. The Petitioners are entitled to costs, but not fees.

Having found the Petitioners should prevail, I turn to their final requests for relief: shifting of attorneys' fees and costs. The Petitioners seek attorneys' fees under Title 10, Section 348 of the Delaware Code. This action was not, however, filed

---

[75] In so holding, I reject the Respondents' argument that this Court's precedent presuming irreparable harm is inapplicable, or less persuasive, because the Petitioners brought suit in their individual capacity. I see no reason to draw this distinction; the Restrictions inure to the benefit of all residents in the Boulder Brook Development, and it would be inequitable to only recognize the harm from one homeowner breaching the community's social contract when the Civic Association pursues relief.

[76] The Respondents failed to quantify the cost of removal, although Ms. Cahill did testify regarding the cost of the construction of the Fence. E. Cahill Dep. 15:9–21. But that cost and the unquantified cost of removal is largely of the Respondents' own making. The Respondents had, at least, constructive notice of the Restrictions before construction. Then immediately before construction began, or during construction, the Yus provided actual notice of the Restrictions. The Respondents decided not to heed those warnings and proceeded at their own risk. This distinguishes this case from *Quail Village Homeowners Association, Inc. v. Rossell*, where there was no evidence that the homeowner "knowingly proceeded with construction at her own risk[,]" and then-Master Griffin, in reliance thereon, approved injunctive relief short of removal (requiring the homeowner to submit a plan for approval). 2018 WL 6534456, at *4; *cf. Tusi v. Mruz*, 2002 WL 31499312, at *5 (Oct. 31, 2002) (acknowledging the "draconian nature of relief requiring demolition of [a] [g]arage" and, nonetheless, ordering same); *Christine Manor Civic Ass'n v. Gullo*, 2007 WL 3301024, at * 4 (Del. Ch. Nov. 2, 2007) (finding "[t]he only equitable and viable remedy available to the Court" where the homeowner built a structure without approval and "at her risk" was "removal of the structure").

under Section 348, which has specific filing requirements under Court of Chancery Rule 174(c)(2). Nor does this action qualify for Section 348 treatment; Section 348 requires at least one party to be a homeowner's association or similar entity, if one exists (which one does, the Civic Association). Absent this statutory shift, and without any other articulated exception, the American Rule applies.[77] The Petitioners' request for attorneys' fees must be denied.

But, under Court of Chancery Rule 54(d), "costs shall be allowed as of course to the prevailing party unless the Court otherwise directs." The prevailing party is the "party who successfully prevails on the merits of the main issue or the party who prevailed on most of their claims."[78] "[T]ypically, the burden lies with the non-prevailing party to rebut the presumption under Court of Chancery Rule 54(d) that the prevailing party should receive costs[.]"[79]

Here, the Petitioners are the prevailing parties. Although I find Section 2 unenforceable, I nevertheless recommend judgment in favor of the Petitioners for the ultimate relief sought (an injunction requiring the Respondents to remove the Fence). The Petitioners are, thus, the prevailing parties. The Respondents have failed

---

[77] *Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007) ("Under the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs.") (citations omitted).

[78] *In re Mindbody, Inc., S'holder Litig.*, 2023 WL 2518149, at *48 (Del. Ch. Mar. 15, 2023).

[79] *In re Oracle Corp. Deriv. Litig.*, 2023 WL 9053148, at *3 (Del. Ch. Dec. 28, 2023).

to rebut the presumption that costs should be shifted and I see no basis on which the presumption should not apply; costs should be shifted in the Petitioners' favor.

## III.  CONCLUSION

For the above reasons, I find in favor of the Petitioners. This Court should issue a permanent injunction requiring the Respondents to remove the Fence. The Respondents should also bear the Petitioners' costs incurred in this action. Further relief should be denied.

This is my final report, and exceptions may be filed under Court of Chancery Rule 144.

Respectfully submitted,

/s/ *Selena E. Molina*

Magistrate in Chancery